IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 7, 2019

## STATE OF TENNESSEE v. SEPTIAN JAMARQUIS VALENTINE

**Appeal from the Circuit Court for Lake County**
**No. 17-CR-10395    R. Lee Moore, Jr., Judge**

_____

### No. W2018-01400-CCA-R3-CD

_____

The Defendant, Septian Jamarquis Valentine, was charged with two counts of rape. See Tenn. Code Ann. § 39-13-503. Following a jury trial, the Defendant was found not guilty on count one and guilty on count two and sentenced to fourteen years incarceration. On appeal, the Defendant contends that error exists because (1) the trial court did not allow Lisa Garrett to testify about the Defendant's negative chlamydia test performed one year after the incident; (2) the evidence was insufficient to convict the Defendant; and (3) a juror, who was "not truthful" during voir dire, "bullied" others into convicting the Defendant. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and THOMAS T. WOODALL, JJ., joined.

Hal J. Boyd, Tiptonville, Tennessee, for the appellant, Septian Jamarquis Valentine.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Danny H. Goodman, Jr., District Attorney General; and Lance Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The Defendant was charged with the rape of two individuals, M.D. and A.G.[1] Following a trial, the Defendant was convicted of raping A.G. but was acquitted of raping M.D.

On March 21, 2018, trial commenced with voir dire examination. Upon the State's asking if anyone was a friend of the Defendant's family, potential juror Rhonda Battee raised her hand. Ms. Battee assured the prosecutor that although she knew the Defendant's grandmother and mother and had worked with the Defendant's aunt, she had no reason to give the Defendant's testimony greater or lesser weight. Soon after, Ms. Battee informed the prosecutor that she knew Ashley Kimmons, a witness for the State. Ms. Kimmons was Ms. Battee's former sister-in-law. Ms. Battee said she had no reason to believe she would give Ms. Kimmons' testimony any greater or lesser weight because of this former relationship.

The State called Shawntel Taylor to testify. In the early morning hours of April 2, 2017, Mr. Taylor saw the Defendant at Garage Bar, a local Tiptonville establishment. At some point in the evening, he saw M.D. and A.G. outside of the bar. He spoke to both women, noting that A.G. "was kind of drunk." While outside of the bar, he heard the Defendant yell at M.D. to stop the car she was driving and saw the Defendant get in the car.

On cross examination, Mr. Taylor explained that he had previously had a relationship with M.D. and that she was upset on the night of April 2 because he had brought his new girlfriend to the bar. M.D. cried in front of Mr. Taylor that night.

M.D. testified on direct examination that she went to Garage Bar with A.G. on the night of April 1, 2017. M.D. saw the Defendant at Garage Bar the same night. She admitted to drinking alcohol, but she could not recall specifically how much she had to drink. She mentioned that the Defendant "was flashing all his money in the air and [she] just grabbed it" to be funny. She denied dancing with the Defendant and relayed that he offered to buy her a drink "[e]very time he seen [sic] [her]." M.D. accepted the Defendant's last offer for a drink, but she handed it to another patron when she was served. She did not consume the drink. She denied flirting with or encouraging the Defendant.

M.D. did not recall A.G.'s indicating that she felt unwell at the bar. However, after both women exited the bar, A.G. could not drive her car "because she was drunk,

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials. Although the Defendant was found not guilty of M.D.'s rape, we will also refer to her using her initials for consistency.

throwing up all in the car." M.D. drove the car. M.D. testified that the Defendant "jump[ed] in the car" and eventually reached over the driver's seat "trying to touch [M.D.'s] private" and she told him to stop.

When questioned about why she did not drop the Defendant off at his intended destination, she responded that she was worried she would be pulled over by a policeman, so she decided to take A.G. home first. A.G. threw up a second time in the car before reaching her apartment.

Upon reaching A.G.'s apartment, M.D. handed keys to the Defendant, and he "said he was going to go unlock the door." A.G. could not walk on her own and was helped inside by M.D. Once inside, A.G. was "passed out" on the living room floor, and M.D. began calling friends for a ride home. The Defendant also entered the apartment.

The Defendant was standing in front of the coffee table and wanted M.D. to "help him count his money." She refused and continued to call friends. A.G. did not wake up during this time. M.D. fell asleep at some point and was awakened by the Defendant on top of her. Her leggings were pulled down to her knees and her legs were in the air. The Defendant's penis was in her vagina. She shoved the Defendant off of her and he pushed himself back on top of her again. She kicked the Defendant and ran out of the apartment. The Defendant followed her.

M.D. called her sister as she was running down Cherry Street. Her sister called the police and drove to retrieve M.D. M.D. denied flirting with, kissing, or making sexual advances toward the Defendant. She denied any previous relationship with the Defendant. She said she was concerned about A.G., who was still asleep on the floor when she ran from the apartment.

Upon officers' arriving at M.D.'s sister's residence, M.D. said she was worried about A.G. Officer Glidewell instructed her to have a rape kit examination. She was escorted to the local hospital by Officer Warren Douglas to have a rape kit examination performed. She met with a sexual abuse nurse examiner, who examined her pelvis and collected several swabs. She confirmed that she gave a statement to Officer Glidewell and testified at the preliminary hearing.

On cross-examination, M.D. testified that she observed A.G. consume a large amount of alcohol. She confirmed that she did not call 911 upon leaving the apartment. Although M.D. acknowledged that she wrote a statement on April 2, 2017, she denied that a statement shown to her by defense counsel was hers. M.D. identified her signature at the end of the statement, however. She denied the written statement's contents that she and the Defendant "laid down on the couch" together. She indicated that the hand-

-3-

written statement was actually her sister's handwriting. M.D. recalled that at the preliminary hearing, she accused the Defendant of giving her chlamydia because the sexual abuse nurse examiner had informed her that she tested positive for the sexually transmitted disease.

Kaylah Howard, M.D.'s sister, testified that on April 2, 2017, she received a call from M.D. M.D. was "crying, very upset, and just asking [Ms. Howard] to come get [M.D.]." Upon picking up M.D., Ms. Howard placed a call to the Lake County Sheriff's Department because M.D. told her that she had been raped by the Defendant. Ms. Howard identified the hand-written statement previously shown to M.D. as being M.D.'s handwriting with her signature.

A.G. testified that she had known the Defendant some eight or nine years but could not recall seeing the Defendant on the night of April 1, 2017. She could not remember getting sick that night. She believed that someone "did something" to one of her drinks. She did not remember agreeing to sexual intercourse.

A.G. testified that on April 2, 2017, she was given a rape examination at the local hospital, was prescribed a "Plan B" pill, and was treated for chlamydia. She denied having a relationship with the Defendant, but she confirmed that the two had engaged in "sexual relations" once before. At the preliminary hearing, A.G. had denied having any sort of "sexual relationship" with the Defendant, but she claimed that she had misunderstood the question.

Upon cross-examination, A.G. testified that her blood alcohol level "was way beyond the legal limit" on the night of the incident. When questioned about giving consent to the Defendant to have sex, A.G. replied, "I did not give consent for anything… I was unconscious… There was no way I could [sic] say yes or no."

The State's next witness, Johnny Parson, testified that he worked at Garage Bar in April 2017 and knew M.D. and A.G. After the bar closed in the early morning hours of April 2, 2017, Mr. Parson visited Ms. Howard's house where he learned via M.D. about what had happened at A.G.'s apartment.

Upon learning this information, Mr. Parson and a friend went to A.G.'s apartment to "check on [A.G.]" and found that "she was in the bed unconscious." He picked A.G. up, carried her to the car, and drove her to Ms. Howard's house. A.G. could not walk or stand on her own.

On cross-examination, Mr. Parson explained that upon arriving at Ms. Howard's house, two police officers were present. He soon left the residence to drive to A.G.'s

apartment to "check on her," despite the two officers being present. Upon arrival, A.G.'s apartment was unlocked. A.G. had clothes on and "was covered in something from the waist down."

Officer Nicholas Stagg of the Tiptonville Police Department testified on behalf of the State. In the early morning hours of April 2, 2017, Officer Stagg encountered the Defendant walking across the yard of Cherry Street Apartments, where A.G. lived. Officer Stagg detained the Defendant and transported him to jail.

Officer Cory Glidewell of the Tiptonville Police Department testified that on April 2, 2017, he asked Mr. Parson to check on A.G. after arriving at Ms. Howard's residence and speaking with M.D. There was no indication that anything had happened to A.G. at this time. Mr. Parson soon returned to Ms. Howard's home with A.G. Officer Glidewell described her as "highly intoxicated." Officer Glidewell continued, "She couldn't stand up without help… She was pretty well passing out with people holding her up." A.G.'s jeans "were covered in vomit."

Officer Glidewell instructed M.D. and A.G. to receive a sexual abuse examination at the local hospital. Officer Glidewell then proceeded to A.G.'s apartment to "check the scene." He "went through the garbage cans, bed sheets, couch cushions, under the couch" and other places searching for a condom or condom wrapper. He did not find one. He also searched A.G.'s car and found a "large puddle of vomit in the passenger side floor board."

After concluding his search, Officer Glidewell proceeded to the jail and spoke with the Defendant. The Defendant was cooperative and admitted to having sex with both M.D. and A.G. The Defendant said that he used a condom while having intercourse with M.D., but that he did not use a condom with A.G.

Upon cross-examination, Officer Glidewell testified that A.G.'s blood alcohol level was high, "but I don't think it was .09." He sent Mr. Parson to A.G.'s apartment because he was "concerned about [her] well-being considering the state of intoxication" after speaking with M.D. He did not see signs of a struggle upon investigation of A.G.'s apartment. A.G. did not remember having sex or vomiting.

Shayna Dance testified on behalf of the Defendant. Ms. Dance had known the Defendant since 2013 and had been in a relationship with the Defendant for a "couple of years." At the time of the incident, the two were "best friends." She had also been good friends with M.D. until around April 2017.

Creston Tyler was the Defendant's lifelong friend and was at Garage Bar on April 1, 2017. Mr. Tyler was also familiar with M.D. and saw the Defendant, M.D., and A.G. at Garage Bar on the night of the incident. He testified that while at the bar, M.D. approached him and the Defendant, and she "started asking [the Defendant if he was] going to leave with [M.D. and A.G.] after [the] bar."

Dominic Kimbrell testified that he was with the Defendant during the early evening hours of April 1, 2017. The Defendant was gambling, and the two went to Garage Bar later that night. Mr. Kimbrell confirmed that he saw M.D. and A.G. at the bar that night and saw both women and the Defendant engaged in conversation. He left the bar before the Defendant.

Calvin Taylor testified that he was at Garage Bar on the night of April 1, 2017. Mr. Taylor had offered the Defendant a ride to Elm Street late that night. Mr. Taylor and the Defendant were walking to Mr. Taylor's car when M.D. and A.G. stopped to ask, "[W]hat are y'all about to do[?]" The Defendant replied, "I'm trying to go with y'all." At this point, M.D. unlocked the back door, and the Defendant got into A.G.'s car.

The Defendant testified that on April 1, 2017, he was celebrating his birthday at Garage Bar. He had won about $1,700 earlier that evening shooting dice. The Defendant arrived at Garage Bar with Dominic and Clint Kimbrell, but he had planned to leave with Calvin Taylor. While walking to Mr. Taylor's truck, M.D. approached the Defendant and asked if he would like to go with her and A.G. The Defendant recognized the car being driven by M.D. and decided to go with them. M.D. drove around "probably [twenty or thirty] minutes." The Defendant testified that at every stop sign, he and M.D. would kiss. Upon reaching Elm Street, the Defendant asked for one more kiss and said, "[Y]ou going to tease me all night." The Defendant asked to go home with M.D. and A.G. The three individuals went to A.G.'s apartment. The Defendant denied that A.G. needed help into the apartment. He had his arm around both women while walking into the apartment.

The Defendant and M.D. had sex on the couch. The Defendant wore a condom. M.D. had to use the restroom at one point, but came back, and the two continued to have sex. The Defendant denied that M.D. kicked him. M.D. then counted the Defendant's money upon his request and she left the apartment. The Defendant denied ever seeing M.D. make phone calls in A.G.'s apartment. The Defendant also denied that M.D. fell asleep on the couch.

While the Defendant and M.D. were having sex, A.G. was leaning against the couch. A.G. was conscious and talking. All three individuals were drunk. After M.D. left the apartment, A.G. invited the Defendant to her room. The Defendant informed

A.G. that he could not stay with her because Mr. Taylor was on his way to get the Defendant. The Defendant and A.G. had sex and both were completely naked.

The Defendant testified that A.G. was naked in bed when he left. He did not put her clothes back on her. A.G. said she would talk to the Defendant tomorrow. The Defendant left the apartment "about 3:15 [a.m]" and was arrested by Officer Staggs shortly thereafter.

On cross-examination, the Defendant denied seeing A.G. throw up in the car, smelling vomit in the car, or seeing vomit on A.G. When questioned about wearing a condom while having sex with M.D., the Defendant testified that he "flushed everything," including both the condom and the wrapper. The Defendant mentioned having two unused condoms to Officer Glidewell after he had been arrested. The Defendant confirmed that he did not mention riding around twenty to thirty minutes before arriving at A.G.'s apartment. The Defendant also confirmed that he did not tell Officer Glidewell that he had sex twice with M.D.

On redirect examination, the Defendant confirmed that he kissed M.D. at every stop sign while driving around. He indicated that he had a romantic history with A.G. and that all three individuals knew each other very well.

On the second day of trial, the Defendant called Lisa Garett of Lake County Primary Care for an offer of proof, outside of the jury's presence. Ms. Garrett confirmed that the Defendant had given a specimen on March 19, 2018 and tested negative for chlamydia. The trial court would not allow the Defendant to present this evidence because it was not relevant and the test had been performed almost an entire year after the incident.

On rebuttal, the State called Sergeant Dakota Leland. Sergeant Leland worked as a dispatcher and correctional officer at the Lake County Sheriff's Department. He testified that a 9-1-1 call was received from Kaylah Howard at 2:22 a.m. on April 2, 2017, and he could hear screaming and crying in the background.

Upon cross-examination, Sergeant Leland confirmed that the Defendant's arrest report from the incident indicated a dispatch was called to report M.D.'s accusations at 2:51 a.m. and that a response was recorded at 3:03 a.m.

Officer Glidewell was recalled by the State and testified that he did a thorough inspection of A.G.'s apartment and that there did not seem to be any signs of drinking or drug use. The State submitted a recording of the Defendant's interview with Officer Glidewell.

-7-

On cross-examination, Officer Glidewell testified that he was off-duty at the time he was contacted to investigate the incident. He had more experience with this type of investigation than the on-duty officers and was familiar with the rape kit used for this type of crime.

The Defendant was found not guilty on count one, the rape of M.D., but was found guilty on count two, the rape of A.G. The jury was polled and the verdict was unanimous.

**MOTION FOR NEW TRIAL**

On June 25, 2018, a hearing on the motion for a new trial was held. The Defendant argued that juror Rhonda Battee was "a ring leader" and bullied three other jurors into convicting the Defendant. The Defendant offered three affidavits obtained from these jurors to support this argument.

The Defendant argued that Ms. Battee "didn't answer the questions truthfully on voir dire" about her relationship to the Defendant. The Defendant called Mary Fields, his aunt, to testify that she was "related somehow" to Ms. Battee's husband, Joe Battee, Jr. Ms. Fields also testified that she knew Ron Fryerson, the Defendant's cousin, and that he had children with Ms. Battee's daughter.

The Defendant then called Damio Yancy, the Defendant's cousin, to testify. Mr. Yancy testified that Joe Battee, Jr., and Ron Fryerson are also the Defendant's cousins. Mr. Yancy described Ms. Battee's relationship with Ron Fryerson as "bad."

Additionally, the Defendant argued that the trial court erred by not allowing Lisa Garrett to testify in front of the jury about the Defendant's negative chlamydia test. The Defendant contended that because both victims testified that the Defendant gave them chlamydia, the negative test "would've gone to [the victims'] credibility and would've gone to [the Defendant's] innocence of having sex with them that night." The Defendant continued that the negative test "was crucial to the case and possibly change [sic] the verdict."

The Defendant argued that A.G.'s blood alcohol level was not high enough to sustain the conviction for rape, that A.G. was fully clothed "when the disc jockey and the girl" found her in the apartment, and that A.G. "had no memory of any sexual activity and there's no medical evidence" to support the conviction.

The State responded that Ms. Battee was truthful during voir dire. Ms. Battee testified at the hearing that her husband was "related to [the Defendant] some kind of

way." Ms. Battee continued that she had not lived with her husband in seventeen years, did not keep in touch with any of his family members, and did not attend her husband's family events. Ms. Battee averred that she did not know she was related to the Defendant by marriage and that she had answered truthfully during voir dire about knowing his grandmother and aunt.

Upon cross-examination, Ms. Battee denied knowing that Ron Fryerson was the Defendant's cousin. Ms. Battee testified that she did not see Mr. Fryerson.

The court did not permit questioning pertaining to Ms. Battee's "bullying" the other jurors relying on Tennessee Rule of Evidence 606. The court stated that it polled each juror after the verdict was read and that "each juror answered the question that it was his or her decision to find [the Defendant] guilty."

Relative to the Defendant's argument that Ms. Battee lied during voir dire, the court found that "there [was] not any definite relationship that was violated... There's nothing to indicate to the [c]ourt that she lied in the voir dire examination." The court further found that nothing indicated Ms. Battee's presence on the jury prejudiced the Defendant.

Relative to Ms. Garrett's proposed testimony, the court found that the test was given "a year after this particular incident occurred" and that the Defendant "elicited [the chlamydia] testimony from the State witnesses" and then "used it to try to impeach their testimony." Additionally, the court noted that the Defendant admitted to having sex with A.G. and found that Ms. Garrett's proposed testimony was not relevant.

Finally, the court found that the evidence was sufficient to sustain the Defendant's conviction, specifically referencing the testimony that A.G. was intoxicated, had passed out, and could not stand on her own later that night, and that also a rape kit was performed. The court denied relief on the Defendant's motion.

The Defendant timely filed a notice of appeal. The case is now before us for review.

## ANALYSIS

The Defendant argues that the trial court erred in excluding evidence that he tested negatively for a sexually transmitted disease at the time of trial; that the evidence was insufficient to sustain his conviction; and that three jurors were "bullied" into reaching a verdict. We will address each issue in turn.

### I. Exclusion of Evidence

The Defendant contends that the trial court erred by excluding Ms. Garrett's testimony regarding the Defendant's negative chlamydia test one year after the incident. The Defendant relies on Tennessee Rule of Evidence 412, known as the Rape Shield Law, arguing the impeachment evidence is proper. The State argues on appeal that the trial court did not rely on Rule 412 but instead excluded the evidence based on lack of relevance even if it were otherwise admissible under Rule 412.

In order to be admissible, evidence must first be relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. "'Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (quoting State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998)) (quotation marks omitted). Decisions regarding the relevance of evidence are reviewed for abuse of discretion. State v. Watson, 227 S.W.3d 622, 649 (Tenn. Crim. App. 2006); State v. Powers, 101 S.W.3d 383, 395 (Tenn. 2003).

The admissibility of impeachment evidence is a matter within the trial court's sound discretion, and we review such decisions under an abuse of discretion standard. See State v. Gomez, 367 S.W.3d 237, 243 (Tenn. 2012). Therefore, "[a] decision to admit evidence will be reversed 'only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning' and the admission of the evidence 'caused an injustice to the party complaining.'" Id. at 243 (quoting State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000)).

The trial court noted that Ms. Garrett's testimony concerning the Defendant's negative chlamydia test was on the record as an offer of proof. The court did not allow Ms. Garrett to testify because the test was given to Defendant "a year after this particular incident occurred." The court found that the negative test was not relevant, noting that the Defendant had admitted to having sex with A.G. on the night of the incident. The court found that the negative test would not have been relevant to the Defendant's case or defense. The court also noted that the Defendant elicited testimony regarding chlamydia from the victim and then attempted to use the information to impeach that witness.

The trial court did not rely on Tennessee Rule of Evidence 412 governing impeachment evidence to exclude Ms. Garrett's testimony. The court instead relied on Tennessee Rule of Evidence 401 and held that the testimony from Ms. Garrett was not

relevant to the Defendant's case as the Defendant had already admitted he had sex with A.G. The negative test would not make it any more or less probable that A.G. was mentally defective, mentally incapacitated, or physically helpless, which was the primary issue of the case. In addition, the trial court noted the passage of time between the incident and the test. We cannot say that the court abused its discretion in excluding the negative test.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to convict him of rape. The Defendant argues that the jury only heard one version of events from the night in question from M.D. He continues that there was no evidence that anyone assisted A.G. with putting her clothes back on after sex; therefore, she must have been conscious, and a reasonable person would have believed she had the ability to consent to sex. The Defendant further argues that it was only upon suggestion of others that A.G. was taken for a rape examination. The State responds that the evidence is sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987)

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this

-11-

court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Tennessee Code Annotated § 39-13-503 states in relevant part, that "[r]ape is [the] unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" when accomplished without consent, or "[t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless" and acted intentionally, knowingly, or recklessly.

At trial, multiple witnesses testified to A.G.'s level of intoxication. Mr. Taylor testified that A.G. was "kind of drunk" when he saw her at the bar. M.D. testified that A.G. was "drunk, throwing up all in the car," when the two left the bar with the Defendant and that A.G. threw up a second time on the drive to the apartment. Additionally, M.D. testified that she had to help A.G. into the apartment before A.G. "passed out" in the apartment floor. Johnny Parson testified that when he arrived at A.G.'s apartment, she was "in the bed unconscious." He had to carry her to his car. Upon arrival to Ms. Howard's house, Officer Glidewell observed that A.G. could not stand up on her own and her pants were "covered in vomit," and he saw a pool of vomit in the passenger seat floorboard of A.G.'s car. Additionally, the Defendant admitted during his testimony that he had sex with A.G. in her bed on the night in question.

In the light most favorable to the State, circumstantial evidence of A.G.'s level of intoxication and inability to give consent was proved at trial, and a rational trier of fact could have found that the Defendant knew or had reason to know that A.G. was too mentally incapacitated to consent to sexual penetration. The jury rejected the Defendant's testimony that he had consensual sex with A.G., and we will not re-weigh the testimony. The evidence is sufficient to convict the Defendant of rape and he is not entitled to relief on this basis.

## III. Improper Jury Conduct

The Defendant contends that the trial court erred by not setting aside his conviction, arguing that Ms. Battee "bullied" others into convicting the Defendant. The State responds that all jurors were polled at the end of the trial, and the vote to convict was unanimous.

In a claim that the jury has been tainted by extraneous prejudicial information, disqualification, mistrial, or a new trial should only be granted when there is extra-judicial communication which is prejudicial to the defendant and not harmless error. State v. Smith, 418 S.W.3d 38, 49 (Tenn. 2013). "A party challenging the validity of a

verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." State v. Adams, 405 S.W.3d 641, 651 (Tenn. 2013); Smith, 418 S.W.3d at 48 (noting that a witness's note to the trial court regarding a communication with a juror was admissible because it "related to potentially prejudicial external influences" and not "the jury's deliberations or the juror's thought processes"). The admissibility of this type of evidence is governed by Tennessee Rule of Evidence 606(b), which states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion.

Unlike extraneous prejudicial information, intra-jury pressure or intimidation are "internal matters that do not involve extraneous information or outside influence." Caldararo ex rel. Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990). Likewise, "a juror's subjective thoughts, fears, and emotions" are internal influences "that are not grounds to overturn a verdict." Id.

The Defendant attempted to admit three affidavits from jurors as grounds to overturn his conviction, stating the jurors all related that Ms. Battee's inappropriate racial remarks pressured them to vote guilty. The Defendant submits that this is extraneous prejudicial information. However, Tennessee Rule of Evidence 606(b) explicitly forbids this type of testimony. See Carruthers v. State, 145 S.W.3d 85 (Tenn. Crim. App. 2003). The affidavits contain information about jury deliberations and jurors' thought processes, but they do not contain proof of extraneous prejudicial information that could have warranted a new trial. We note that Ms. Battee denied any wrongdoing at the motion for a new trial hearing. Internal jury influences are not grounds to overturn a verdict. The Defendant is not entitled to relief on this basis.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed.

D. KELLY THOMAS, JR., JUDGE